[Crim. No. 418.   Third Appellate District.—June 18, 1918.]

## THE PEOPLE, Respondent, v. WILLIAM YEE, Appellant.

CRIMINAL LAW — MURDER — EVIDENCE — INSTRUCTION AS TO MANSLAUGHTER—PROPER REFUSAL.—Where in a prosecution for murder the evidence showed the deceased was deliberately and wantonly shot to death without cause or provocation, and the defendant relied upon and attempted to establish an *alibi*, the court properly refused to give an instruction defining manslaughter.

ID.—AIDING, ASSISTING, AND ABETTING IN COMMISSION OF CRIME — GUILT OF ACCESSORY — PROPER INSTRUCTION.—An instruction that one aiding, assisting, and encouraging another in committing a criminal act is guilty equally with the perpetrator, and that to justify conviction it must be shown he aided, assisted, and abetted therein, is a correct statement of the law of accessories, declared in sections 31 and 971 of the Penal Code, the word "abetted" including knowledge of the wrongful purpose of the perpetrator and counsel and encouragement in the crime.

ID.—INSTRUCTION—ACCESSORIES.—Where in a prosecution for murder two others were charged with the defendant with the commission of the homicide, and the district attorney in his argument to the jury declared that under the evidence they were justified in finding defendant guilty, although they might find that he did not himself actually do the killing, it was necessary for the court to read to the jury an instruction embracing the principle declared in sections 31 and 971 of the Penal Code, as to accessories in crime.

ID.—MOTIVE FOR CRIME—EXISTENCE OF "TONG WAR" AMONG CHINESE— ARGUMENT OF DISTRICT ATTORNEY—EVIDENCE—LACK OF PREJUDICE. Where in a prosecution of a Chinaman for murder, the evidence was sufficient to warrant a conviction, without showing motive, the argument of the district attorney declaring the existence of a "tong war" and that the homicide resulted from it was harmless.

ID.—MOTIVE—WHEN IMMATERIAL.—While proof of motive is important in a case wholly dependent for its establishment upon circumstantial evidence, yet where the crime is established by direct evidence, proof of motive is entirely unimportant.

APPEAL from a judgment of the Superior Court of Sonoma County, and from an order denying a new trial. George H. Cabaniss, Judge Presiding.

The facts are stated in the opinion of the court.

W. F. Cowan, for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

HART, J.—The defendant, jointly with two other Chinese, named, respectively, · Toy Yock and Lee Sing Park, was charged by information filed in the superior court of Sonoma County with the crime of murder. The defendant was given a separate trial and was convicted of murder of the first degree, the jury fixing the penalty at imprisonment for life. He appeals from the judgment and the order denying him a new trial.

The homicide occurred on Sunday, the eleventh day of March, 1917, at about the hour of 3 P. M., on the farm. of one Finley, situated between four and five miles north of the city of Santa Rosa.

The deceased, one Hom Hong, at the time of the homicide, was employed as a laborer on the Finley ranch, as were some dozen or more other Chinese.

There is ample evidence from which the jury were warranted in finding these facts: That, at about the noon hour of the said eleventh day of March, one Potter, a taxicab driver at Santa Rosa, received an order by telephone from Sebastopol, a town situated a short distance from Santa Rosa, for a taxicab; that, acting upon the order so received, he drove to Sebastopol and upon reaching a point near that town was stopped by a Chinaman, who was standing in the middle of the road, waving his hand, evidently for the purpose of attracting the driver's attention and so stopping the machine. Potter brought the taxi to a stop and shortly thereafter four Chinese entered the machine, three taking seats inside and one taking the outside seat, riding by the side of the driver. Acting under the direction of the man sitting by his side, Potter took a circuitous route to the Finley ranch. Upon arriving at a point a short distance from the gate leading into the ranch, Potter was told by the Chinese to stop the machine, and, upon doing so, the four Chinese left the taxi, instructing Potter to remain at the spot where he had stopped until their return, which, they said, would not be over fifteen or twenty minutes. Three of the Chinese passed through the gate into the Finley prem-

ises and thence to the cabin near which an aged Chinese, one Won Fong You, who was employed as a foreman and who also devoted himself to looking after and attending the flower garden on the place, was walking about the garden. Won Fong You, observing the three Chinese, who were strangers to him, greeted and invited them into the cabin to partake of a cup of tea. The defendant and another of the three Chinese accepted the invitation, the third remaining outside the cabin. At this time, Hom Hong, the deceased, and a number of other Chinamen were engaged in chopping wood near the cabin. Finishing the tea, the two Chinese left the cabin and immediately went to the spot where Hom Hong was engaged in chopping wood "on a block," about thirty feet from the cabin, and the defendant at once opened fire upon Hong with a pistol, shooting at him five times, four of the bullets entering his body, almost instantly causing his death. The third Chinaman—the one who did not partake of tea—remained near the cabin door while the shooting was going on. After the killing of Hom Hong the defendant threw the pistol with which he did the shooting into the hop-field near by, and thereupon the three Chinese hastened to the place at which they had left the taxi, entered the machine, and ordered the driver to take them back to Sebastopol. On reaching a point near what is known as "Old Chinatown," in Sebastopol, the Chinese got out of the machine. The taxi driver, upon receiving pay for his services, started back to Santa Rosa, leaving the three Chinese at Sebastopol.

The sheriff of Sonoma County, having been immediately notified of the homicide after it occurred, started post haste for the Finley ranch, where, upon his arrival, he found the dead body of Hom Hong lying "crumpled" on the ground. The sheriff, shortly after his arrival, found a pistol, with five chambers, in the hop-field a very short distance from where the body of Hom Hong lay. Five empty cartridge shells were found in the weapon.

An inquest was held by the coroner on the evening following the day of the homicide and at the same time an autoptical examination of the body of the deceased was made by Drs. Temple and Scamell. It is not necessary to present herein a description of the several wounds, as given by the doctors at the trial. It is enough to say that the point of

entrance of each of the four bullets which went into the body of the deceased was such as conclusively to show that, when shot, the deceased had his back or side toward his assailant. In other words, it is obvious, from the point of entrance into the body of each of the bullets, that the deceased was at no time squarely facing the man who did the shooting.

The point first urged for a reversal grows out of the omission by the court to give to the jury an instruction defining manslaughter.

Instructions must be pertinent to the evidence received into the record, and, manifestly, it is not error to refuse or fail to give an instruction having no bearing upon any of the facts proved. The undisputed evidence in this case (synoptically given above) did not warrant an instruction defining manslaughter. According to the evidence, the deceased was assassinated—deliberately and wantonly shot to death without cause or provocation, and there was, therefore, no element of manslaughter in the act of killing. And certainly there was no such element in the case, so far as the defendant was concerned, for he relied upon and attempted to establish an *alibi,* and, as the position thus assumed by him in the case implied, he did not pretend to know anything about the homicide, how it occurred or by whom perpetrated, and, therefore, introduced no proof which would reduce or tend to reduce the crime to that of manslaughter. It was, as stated, according to the evidence produced by the people, a cold-blooded murder and nothing less. The supreme court has time and again very properly held that in such a case it is not error for the trial court to refuse or omit to instruct the jury upon manslaughter. (See *People v. Turley,* 50 Cal. 469; *People v. Lee Gam,* 69 Cal. 552, [11 Pac. 183]; *People* v. *Chavez,* 103 Cal. 408, [37 Pac. 389]; *People* v. *Chaves,* 122 Cal. 134, 140, [54 Pac. 596]; *People v. Fellows,* 122 Cal. 233, 240, [54 Pac. 830].)

It is next contended that the court should have given to the jury a more definite definition of "an absent accessory and what acts were required of such accessory to constitute guilt" than it did.

According to the evidence, the defendant was not an "absent accessory," by which is meant a participant in the commission of the crime who was not present at the scene of the

crime when it was committed and who did not actually commit the criminal act. As has been shown, the defendant, under the evidence, was either present at and took an active part in the commission of the crime, or, accepting the proof addressed to his attempted *alibi*, had no connection whatever with the crime or the commission thereof. Of course, it was proper, and, indeed, necessary, for the court to read to the jury an instruction embracing the principle declared in sections 31 and 971 of the Penal Code as to accessories in crime, for the reason that the defendant was charged with two others with the commission of the homicide, and for the further reason that the district attorney, in his argument to the jury, declared that, under the evidence, they were justified in finding the defendant guilty, although they might find that he did not himself actually do the killing. And the court did so instruct the jury as follows: "If two or more persons plan and undertake the commission of a criminal offense and pursuant to that agreement the actual criminal offense or act denounced by the law as a crime is committed by one of the several parties, he being aided and assisted and encouraged in so doing by the other or others with whom he has so planned or agreed, under our law the participants in a criminal act accomplished under those circumstances are alike guilty. That is to say, those, if such there be, who *aided, assisted, and abetted* the commission of the act or participated in the commission of the crime as just stated are deemed by the law as guilty of the act as they would have been, you might say, had it actually been committed by them or one of their number."

It may be conceded that, under the decisions, the first part of the above instruction, taken alone, falls a little short of stating the rule correctly, for it would then merely have told the jury, in effect, that one aiding and assisting and encouraging another in committing a criminal act would be equally guilty with the perpetrator of the act himself. This, as stated, does not correctly state the rule, because one might innocently aid and assist and encourage another to commit an act which is criminal. (*People* v. *Dole,* 122 Cal. 486, 492, [68 Am. St. Rep. 50, 55 Pac. 581].) But, as will be observed, the court followed the language thus referred to with the statement that, to justify the conviction of one who did not himself actually commit the criminal act, it must be

shown that he aided, assisted, *and abetted* therein, the word "abetted," unlike the words immediately preceding it, including "knowledge of the wrongful purpose of the perpetrator and counsel and encouragement in the crime." (*People* v. *Dole, supra; People* v. *Bond*, 13 Cal. App. 175, 185, [109 Pac. 150].) Thus the rule was clearly and correctly stated to the jury, and it cannot be doubted that they well understood from it that, to warrant the conviction of a person who did not himself actually commit a criminal act, it was requisite to show that he abetted, or what is the equivalent in legal signification to that word, criminally or with guilty knowledge and intent aided the actual perpetrator in the commission of the act. Moreover, even if the instruction involved an erroneous statement of the rule, it could hardly be said to be prejudicial in its effect upon the rights of the defendant; inasmuch as all the evidence, save that which he offered in support of his claim of *alibi*, tended to show that he himself actually committed the act of killing.

The last point to which special attention is given in the appellant's brief is that the district attorney, for the purpose of developing in the minds of the jury a motive for the commission of the homicide, declared that there existed a "tong war" among the Chinese at about and before the date of the killing, and further declared that the defendant was a member of one of the hostile and warring tongs.

Conceding that there is no evidence in the record that a tong war was in progress and the killing of Hom Hong was the result of hostilities arising and existing between rival Chinese societies, still we do not think the defendant could have been harmed by the remarks of the district attorney in that particular. The evidence upon which the prosecution relied for a conviction was sufficient to warrant a verdict of guilty without showing motive or undertaking by argument to work one out of the evidence. While proof of motive is important in a case wholly dependent for its establishment upon circumstantial evidence, yet where the crime is brought directly home to the accused—that is, by direct evidence it is shown that he committed the crime—then the proof of motive is entirely unimportant. In this case, it is highly probable that the jury founded their verdict entirely on the direct testimony tending to show that the accused was one of the actual perpetrators of the crime and did not stop to

look for a motive or pay any heed to the remarks of the district attorney relative to motive or the existence of hostilities between rival Chinese factions. But an examination of the record will disclose that there was in the testimony *some* reference to a tong war, and this testimony came from the defense itself. It was brought out in this way: A Chinese witness for the people, named Bing Lee, testified that he saw the defendant and his companions alight from the taxicab near old Chinatown, in Sebastopol, on the day of the homicide and after the killing had taken place. Several witnesses, among them a police officer of Sebastopol, who was acquainted with Bing Lee, were called by the defense to testify, and did testify, that Bing Lee had not been seen in or about Sebastopol for several days before or after the eleventh day of March, 1917, and that he was not seen there on that day. Reference to page 517 of the transcript will show that counsel for the defense asked his witness, Sing Wo, if he did not hear that a tong war was on, and, if so, when he first heard of it, to which the witness replied that he heard of such a "war" before the killing of Hom Hong. And on page 523 will be found a like question to the police officer, who testified that he had received information of tong hostilities before the date of the homicide. It is true that the defendant was not shown to have been connected with either one of the warring tongs, but, in argument, it is permissible for an attorney to deduce any legitimate theory of the case which the evidence may reasonably afford, and since the attorney for the defendant himself seemed to assume that a tong war was in progress, and in fact filed an affidavit made by the defendant and upon which he predicated a motion for a continuance, in which it was declared without qualification that a tong war was going on prior to, at the time of, and after the homicide, we cannot say that the district attorney overstepped the record very far by referring to the existence of a tong war and the homicide as a probable culmination thereof. In any event, however, as above stated, the defendant could have suffered no prejudice from the district attorney's remarks.

The judgment and the order are affirmed.

Chipman, P. J., and Burnett, J., concurred.